Filed 8/16/12

# IN THE SUPREME COURT OF CALIFORNIA

PINNACLE MUSEUM TOWER ASSOCIATION,

        Plaintiff and Respondent,

        v.

PINNACLE MARKET DEVELOPMENT (US), LLC, et al.

        Defendants and Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

S186149

Ct.App. 4/1 D055422

San Diego County
Super. Ct. No.
37-2008-00096678-
CU-CD-CTL

An owners association filed the instant construction defect action against a condominium developer, seeking recovery for damage to its property and damage to the separate interests of the condominium owners who compose its membership. In response, the developer filed a motion to compel arbitration, based on a clause in the recorded declaration of covenants, conditions, and restrictions providing that the association and the individual owners agree to resolve any construction dispute with the developer through binding arbitration in accordance with the Federal Arbitration Act (FAA; 9 U.S.C. § 1 et seq.).

We granted review to determine whether the arbitration clause is binding on the association, and if so, whether it must be invalidated as unconscionable. As we shall explain, even though the association did not exist as an entity independent of the developer when the declaration was drafted and recorded, it is settled under

1

the statutory and decisional law pertaining to common interest developments that the covenants and terms in the recorded declaration reflect written promises and agreements that are subject to enforcement against the association. We conclude that the arbitration clause binds the association and is not unconscionable.

## FACTUAL AND PROCEDURAL BACKGROUND

Pinnacle Market Development (US), LLC, and others (collectively Pinnacle) developed a mixed use residential and commercial common interest community in San Diego known as the Pinnacle Museum Tower Condominium (the Project). Pursuant to the Davis-Stirling Common Interest Development Act (Civ. Code, § 1350 et seq.; the Davis-Stirling Act or the Act), Pinnacle, as the owner and developer of the Project property, drafted and recorded a "Declaration of Restrictions" to govern its use and operation (the Project CC&R's). The Project CC&R's contains a number of easements, restrictions and covenants, which it describes as "enforceable equitable servitudes" and "binding on all parties having any right, title or interest" in the property, and their heirs, successors and assigns. The Project CC&R's also provided for the creation of a nonprofit mutual benefit corporation called the Pinnacle Museum Tower Association (the Association) to serve as the owners association responsible for managing and maintaining the Project property.

In selling the Project units, Pinnacle conveyed to each buyer an airspace condominium in fee and a proportionate undivided interest in the common area as a tenant in common. All other real property (including the property in the tower module, the parking structure, and other appurtenances) was deeded directly to the Association in fee.[1] Pursuant to the Project CC&R's, each condominium owner is

---

[1] The condominium owners have easements over the Association's property.

2

a member of the Association with certain voting rights, and each agrees to pay assessments for all purposes described in the declaration, including the Association's maintenance and improvement of the Association's property and the common areas.

As relevant here, article XVIII of the Project CC&R's (article XVIII) recites that, by accepting a deed for any portion of the Project property, the Association and each condominium owner agree to waive their right to a jury trial and to have any construction dispute resolved exclusively through binding arbitration in accordance with the FAA and the California Arbitration Act (CAA; Code Civ. Proc., § 1280 et seq.).[2] Article XVIII specifies that it applies only to a construction dispute in which Pinnacle has been named as a party, and provides that no amendment may be made to its terms without Pinnacle's written consent.

The individual owners bought condominium units in the Project pursuant to a standard purchase agreement. The agreement anticipated creation of the Association and explicitly provided: "By acceptance of the Grant Deed to the

---

[2]     Section 18.3(j) of article XVIII states in relevant part: "WAIVER OF JURY TRIAL AND RIGHT TO APPEAL. DECLARANT [PINNACLE], AND BY ACCEPTING A DEED FOR ANY PORTION OF THE TOWER ASSOCIATION PROPERTY, THE ASSOCIATION AND EACH OWNER, AGREE (i) TO HAVE ANY CONSTRUCTION DISPUTE DECIDED BY NEUTRAL ARBITRATION IN ACCORDANCE WITH THE FEDERAL ARBITRATION ACT AND THE CALIFORNIA ARBITRATION ACT, TO THE EXTENT THE CALIFORNIA ARBITRATION ACT IS CONSISTENT WITH THE FEDERAL ARBITRATION ACT; (ii) TO GIVE UP ANY RIGHTS THEY MIGHT POSSESS TO HAVE THE CONSTRUCTION DISPUTE LITIGATED IN A COURT OR JURY TRIAL; (iii) TO GIVE UP THEIR RESPECTIVE RIGHTS TO APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE APPLICABLE ARBITRATION RULES OR STATUTES. IF ANY PARTY REFUSES TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, SUCH PARTY MAY BE COMPELLED TO ARBITRATE . . . ."

Condominium, Buyer shall be deemed to have accepted and agreed to comply" with the recorded Project CC&R's. Section 8 of the purchase agreement stated that, by agreeing to resolve all disputes as provided in article XVIII, the parties give up their respective rights to have such disputes tried before a jury. Section 8 also required the parties to initial a provision reciting their agreement "TO COMPLY WITH ARTICLE XVIII OF THE DECLARATION WITH RESPECT TO THE DISPUTE REFERENCED THEREIN."[3]

The Association filed the instant action against Pinnacle, alleging that construction defects caused damage to the Project. As the sole plaintiff, the Association seeks recovery not only for damage to its own property, but also for damage to the interests held by its individual members. The Association claims standing to represent the owners' interests pursuant to Civil Code section 1368.3, which grants an owners association the requisite standing to sue a developer in its own name for damage to the common areas and damage to the separate interests the association is obligated to maintain or repair. (See *Windham at Carmel Mountain Ranch Assn. v. Superior Court* (2003) 109 Cal.App.4th 1162, 1172, 1174-1175 [addressing predecessor to Civ. Code § 1368.3]; see also Civ. Code, § 945.)

Pinnacle filed a motion to compel arbitration, contending the FAA mandates enforcement of article XVIII's arbitration provisions. The trial court determined that the FAA is applicable and that article XVIII embodies an agreement to arbitrate between Pinnacle and the Association. Nonetheless, the

---

**3** The Association does not dispute that section 8 of the purchase agreement and article XVIII of the Project CC&R's together constitute an agreement to arbitrate between Pinnacle and the original condominium owners. Likewise, Pinnacle does not challenge the trial court's determination that section 8 does not bind the Association, which was not a party to the purchase agreements.

4

court invalidated the agreement upon finding it marked by slight substantive unconscionability and a high degree of procedural unconscionability.

The Court of Appeal affirmed. Although finding unanimously that the FAA is applicable, the court concluded, by a split vote, that the arbitration clause in the Project CC&R's does not constitute an agreement sufficient to waive the Association's constitutional right to jury trial for construction defect claims. The majority additionally held that, even assuming the Association is bound by the jury waivers in the purchase agreements signed by the individual condominium owners, the waivers are unconscionable and unenforceable.

We granted Pinnacle's petition for review.

## DISCUSSION

Article XVIII of the Project CC&R's provides that Pinnacle and, by accepting a deed to any portion of the Project property, the Association and each individual condominium owner agree to submit any construction dispute to binding arbitration in accordance with the FAA (and the CAA to the extent it is consistent with the FAA). (See *ante*, fn. 2.) To determine whether article XVIII is binding upon and enforceable against the Association, we consider the rules governing compelled arbitration of claims, the principles relating to the contractual nature of the covenants and restrictions in a declaration recorded pursuant to the Davis-Stirling Act, and the doctrine of unconscionability.

### A. Arbitration under the FAA

Consistent with the express terms of article XVIII, both the trial court and the Court of Appeal determined that the FAA applies in this case because materials and products incorporated into the Project were manufactured in other states. (9 U.S.C. § 2; see *Allied-Bruce Terminix Cos. v. Dobson* (1995) 513 U.S. 265, 281-282 (*Allied-Bruce*).) Although the Association currently disputes the

5

FAA's applicability, we accept the determination of the lower courts because the issue was not preserved for review.

Section 2 of the FAA provides in relevant part: "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2.) This statute stands as "a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." (*Moses H. Cone Hospital v. Mercury Constr. Corp.* (1983) 460 U.S. 1, 24 (*Moses H. Cone*).)[4]

To ensure that arbitration agreements are enforced according to their terms, "the FAA pre-empts state laws which 'require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration.' " (*Volt Info. Sciences v. Leland Stanford Jr. U.* (1989) 489 U.S. 468, 478 (*Volt*); e.g., *Perry v. Thomas* (1987) 482 U.S. 483 [FAA preempts Cal. Labor Code provision allowing maintenance of wage collection actions despite private agreement to arbitrate]; *Southland Corp. v. Keating* (1984) 465 U.S. 1 [FAA preempts Cal. statute rendering agreements to arbitrate franchise claims unenforceable].) Likewise, the FAA precludes a court from construing an arbitration agreement "in a manner different from that in which it otherwise construes nonarbitration

---

**4** The CAA's comprehensive statutory scheme also expresses a " ' " 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.' " ' " (*Schatz v. Allen Matkins Leck Gamble & Mallory LLP* (2009) 45 Cal.4th 557, 564.) In terms similar to the FAA, the CAA provides that "[a] written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." (Code Civ. Proc., § 1281.)

agreements under state law. Nor may a court rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable, for this would enable the court to effect what . . . the state legislature cannot." (*Perry*, at pp. 492-493, fn. 9.)

One of the consequences of the FAA's applicability is its effect on Code of Civil Procedure section 1298.7, which allows a purchaser to pursue a construction and design defect action against a developer in court, even when the parties have signed a real property purchase and sale agreement containing an arbitration clause.[5] Even assuming this California statute might otherwise extend to a recorded condominium declaration, the FAA would preempt its application here because it discriminates against arbitration. (See *Shepard v. Edward Mackay Enterprises, Inc.* (2007) 148 Cal.App.4th 1092, 1095.) The Court of Appeal agreed on this point, and the Association does not rely on this statute to avoid arbitration.

Nonetheless, it is a cardinal principle that arbitration under the FAA "is a matter of consent, not coercion." (*Volt*, *supra*, 489 U.S. at p. 479.) Thus, " 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' " (*AT&T Technologies v. Communications Workers* (1986) 475 U.S. 643, 648; see *Cronus Investments, Inc. v. Concierge Services* (2005) 35 Cal.4th 376, 384-385.) In determining the rights of parties to enforce an arbitration agreement within the FAA's scope, courts apply state contract law

---

[5] Code of Civil Procedure section 1298.7 provides in relevant part: "In the event an arbitration provision is included in a contract or agreement covered by this title it shall not preclude or limit . . . any right of action to which Section 337.1 [limitations period for patent design or construction defects] or 337.15 [limitations period for latent design or construction defects] is applicable."

7

while giving due regard to the federal policy favoring arbitration. (*Volt*, at p. 474; see *Moses H. Cone*, *supra*, 460 U.S. at p. 24.)

In California, "[g]eneral principles of contract law determine whether the parties have entered a binding agreement to arbitrate." (*Craig v. Brown & Root, Inc.* (2000) 84 Cal.App.4th 416, 420; see *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972-973.) Generally, an arbitration agreement must be memorialized in writing. (*Fagelbaum & Heller LLP v. Smylie* (2009) 174 Cal.App.4th 1351, 1363.) A party's acceptance of an agreement to arbitrate may be express, as where a party signs the agreement. A signed agreement is not necessary, however, and a party's acceptance may be implied in fact (e.g., *Craig*, at p. 420 [employee's continued employment constitutes acceptance of an arbitration agreement proposed by the employer]) or be effectuated by delegated consent (e.g., *Ruiz v. Podolsky* (2010) 50 Cal.4th 838, 852-854 (*Ruiz*).) An arbitration clause within a contract may be binding on a party even if the party never actually read the clause. (*24 Hour Fitness, Inc. v. Superior Court* (1998) 66 Cal.App.4th 1199, 1215.)

The party seeking arbitration bears the burden of proving the existence of an arbitration agreement, and the party opposing arbitration bears the burden of proving any defense, such as unconscionability. (*Engalla v. Permanente Medical Group, Inc.*, *supra*, 15 Cal.4th at p. 972.) Where, as here, the evidence is not in conflict, we review the trial court's denial of arbitration de novo. (*Service Employees Internat. Union, Local 1021 v. County of San Joaquin* (2011) 202 Cal.App.4th 449, 455.)

**B. Contractual Nature of Terms in a Recorded Declaration**

The Davis-Stirling Act governs the creation and operation of common interest developments such as the condominium development here. Pursuant to

the Act, a condominium development may be created when a developer of land records a declaration and other documents to that effect and thereafter conveys one of the units in the development.  (Civ. Code, § 1352.)

As one of the primary documents governing the development's operation, the declaration must set forth a legal description of the development, the name of the owners association that will own or operate the development's common areas and facilities, and the covenants and use restrictions that are intended to be enforceable equitable servitudes.  (Civ. Code, §§ 1351, 1353.)  In addition, the declaration may "contain any other matters the original signator of the declaration [e.g., the developer] or the owners consider appropriate."  (Civ. Code, § 1353, subd. (b); Cal. Code Regs., tit. 10, § 2792.8, subd. (a).)

Terms commonly included in a declaration concern membership and voting rights in the owners association, maintenance responsibilities, procedures for calculating and collecting assessments, accounting and insurance requirements, architectural and/or design control, and enforcement of the declaration.  Pursuant to state regulatory law, a declaration may also include provisions for binding or nonbinding arbitration of disputes between a developer and an owners association, so long as the designated process for arbitration satisfies certain regulatory requirements.  (Bus. & Prof. Code, §§ 11001, 11004.5, 11018.5; Cal. Code Regs., tit. 10, § 2791.8; see *post*, fn. 7.)  When terms have been included for the benefit of the declarant (developer), an association's ability to delete them is limited. That is, although an association may freely amend a declaration to remove certain types of restrictions once the developer has completed its construction and marketing activities (Civ. Code, § 1355.5, subds. (a), (b)), no court may approve an amendment that will "eliminate any special rights, preferences, or privileges designated in the declaration as belonging to the declarant, without the consent of the declarant" (Civ. Code, § 1356, subd. (e)(2)).

9

Once the first buyer manifests acceptance of the covenants and restrictions in the declaration by purchasing a unit, the common interest development is created (Civ. Code, § 1352), and all such terms become "enforceable equitable servitudes, unless unreasonable" and "inure to the benefit of and bind all owners of separate interests in the development." (Civ. Code, § 1354, subd. (a); see Bus. & Prof. Code, § 11018.5, subd. (c).) For this reason, we have described recorded declarations as "the primary means of achieving the stability and predictability so essential to the success of a shared ownership housing development." (*Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 382 (*Nahrstedt*).) Having a single set of recorded covenants and restrictions that applies to an entire common interest development protects the intent, expectations, and wishes of those buying into the development and the community as a whole by ensuring that promises concerning the character and operation of the development are kept. (See *Citizens for Covenant Compliance v. Anderson* (1995) 12 Cal.4th 345, 364 (*Citizens for Covenant Compliance*); *Nahrstedt*, at p. 383.)

One important feature contributing to the stability and success of condominium developments is that actual notice is not required for enforcement of a recorded declaration's terms against subsequent purchasers. (*Nahrstedt*, *supra*, 8 Cal.4th at p. 379.) Rather, the recording of a declaration with the county recorder "provides sufficient notice to permit the enforcement" of the covenants and restrictions contained therein (*ibid.*; see *Citizens for Covenant Compliance*, *supra*, 12 Cal.4th at pp. 364-365; *Villa Milano Homeowners Assn. v. Il Davorge* (2000) 84 Cal.App.4th 819, 825 (*Villa Milano*)), and condominium purchasers are "deemed to agree" to them. (*Citizens for Covenant Compliance*, at p. 365; see *Villa Milano*, at p. 825.)

In this regard, the Legislature has provided various protections to help ensure that condominium purchasers know what they are buying into. For

10

example, developers and subsequent sellers must provide copies of the declaration and other governing documents to prospective purchasers. (Bus. & Prof. Code, § 11018.6; Civ. Code, § 1368, subd. (a).) Additionally, developers generally must provide prospective purchasers with a copy of the Department of Real Estate's public report approving the particular condominium development and a copy of a statutory statement outlining general information regarding common interest developments. (Bus. & Prof. Code, § 11018.1, subds. (a), (c); see Bus. & Prof. Code, § 11018.2.) The statutory statement informs prospective purchasers that their ownership in the development and their rights and remedies as members of its association "will be controlled by governing instruments" such as the "Declaration of Restrictions (also known as CC&R's)," and that they should "[s]tudy these documents carefully before entering into a contract to purchase a subdivision interest." (Bus. & Prof. Code, § 11018.1, subd. (c).) Hence, condominium owners should not be surprised by the covenants and restrictions in a recorded declaration, which ordinarily are given binding effect even if they would not fulfill the common law requirements for creation of an equitable servitude or a restrictive covenant (*Villa De Las Palmas Homeowners Assn. v. Terifaj* (2004) 33 Cal.4th 73, 87), or the privity requirements of a contract (Civ. Code, §§ 1350-1378; *Nahrstedt*, *supra*, 8 Cal.4th at p. 380).

Another significant way in which the Act promotes stability and predictability is by providing that the "covenants and restrictions in the declaration shall be enforceable equitable servitudes, *unless unreasonable*, and shall inure to the benefit of and bind all owners of the separate interests in the development." (Civ. Code, § 1354, subd. (a), italics added.) This statutory presumption of reasonableness requires that recorded covenants and restrictions be enforced " 'unless they are wholly arbitrary, violate a fundamental public policy, or impose a burden on the use of affected land that far outweighs any benefit.' " (*Villa De*

11

*Las Palmas Homeowners Assn. v. Terifaj*, *supra*, 33 Cal.4th at p. 88 [quoting *Nahrstedt*, *supra*, 8 Cal.4th at p. 382].)

In *Nahrstedt*, *supra*, 8 Cal.4th 361, we elaborated upon the contractual nature of a declaration and the enforcement of its terms as equitable servitudes under the Davis-Stirling Act. "[E]quitable servitudes permit courts to enforce promises restricting land use when there is no privity of contract between the party seeking to enforce the contract and the party resisting enforcement. Like any promise given in exchange for consideration, an agreement to refrain from a particular use of land is subject to contract principles, under which courts try 'to effectuate the legitimate desires of the covenanting parties.' [Citation.] When landowners express the intention to limit land use, 'that intention should be carried out.' " (*Nahrstedt*, at pp. 380-381.) Although *Nahrstedt* spoke specifically in terms of land use restrictions, its analysis logically extends to all covenants in a declaration, which by statute are also enforceable as equitable servitudes unless unreasonable. (Civ. Code, § 1354, subd. (a); e.g., *Arias v. Katella Townhouse Homeowners Assn., Inc.* (2005) 127 Cal.App.4th 847 [condominium owner who prevailed in enforcement action entitled to recover contractual attorney fees under CC&R's].)

Moreover, settled principles of condominium law establish that an owners association, like its constituent members, must act in conformity with the terms of a recorded declaration. (See Civ. Code, § 1354, subd. (a); *Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249, 268 [homeowner can sue association to compel enforcement of declaration's provisions]; *Ritter & Ritter, Inc. Pension & Profit Plan v. The Churchill Condominium Assn.* (2008) 166 Cal.App.4th 103, 124.) There is, of course, no question that an owners association functions as an entity distinct and separate from its owner members and may hold title to real property in a condominium development in its own

12

name.  However, an association must exercise its property rights and its right of management over the affairs of a development in a manner consistent with the covenants, conditions, and restrictions of the declaration.  That a declaration operates to bind an association is both logical and sound, for the success of a development would be gravely undermined if the association were allowed to disregard the intent, expectations, and wishes of those whose collective interests the association represents.  (See *Citizens for Covenant Compliance*, *supra*, 12 Cal.4th at p. 364; *Nahrstedt*, *supra*, 8 Cal.4th at pp. 382-384.)

In light of the foregoing, it is no surprise that courts have described recorded declarations as contracts.  (E.g., *Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 512-513 [CC&R's as contract between condominium owners association and unit owner]; *Villa Milano*, *supra*, 84 Cal.App.4th at pp. 824-826 [CC&R's as contract between developer and homeowners association]; see *Barrett v. Dawson* (1998) 61 Cal.App.4th 1048, 1054 [right of neighbors to enforce a recorded restrictive covenant limiting the neighboring property's use was "clearly contractual"]; *Harbor View Hills Community Assn. v. Torley* (1992) 5 Cal.App.4th 343, 346-349 [amendment to Civ. Code § 1717, which governs contractual attorney fees, was applicable to CC&R's of homeowners association]; see also *Franklin v. Marie Antoinette Condominium Owners Assn.* (1993) 19 Cal.App.4th 824, 828, 833 [accepting parties' assumption that CC&R's formed a contract between condominium owners and owners association].)

In the proceedings below, the Court of Appeal held the arbitration clause in the Project CC&R's was not binding on the Association.  Specifically, the court observed that the Association could not have agreed to arbitrate or waive its constitutional right to a jury trial, because "for all intents and purposes, Pinnacle was the only party to the 'agreement,' and there was no independent homeowners

13

association when Pinnacle recorded the CC&R's."  This reasoning is not persuasive in light of the statutory and contract principles at play.

"It is true we have emphasized that arbitration derives its legitimacy from the fact that the parties consent to resort to the arbitral forum rather than to litigation, with its possibility of a jury trial.  [Citation.]  Such consent is generally required."  (*Ruiz*, *supra*, 50 Cal.4th at p. 852.)  As we have previously recognized, however, various legal theories allow for delegated authority to consent.  Not only do common law principles such as fiduciary duty and agency permit enforcement of arbitration agreements against nonsignatory third parties, but the Legislature can also provide for the reasonable delegation of authority to consent.  (*Id*. at pp. 852-854.)

In *Ruiz*, *supra*, 50 Cal.4th 838, we addressed the operation of Code of Civil Procedure section 1295, which allowed, but did not require, a patient to contract with a health care provider to resolve all medical malpractice claims through binding arbitration.  The question presented was whether an arbitration agreement signed by a patient applied to the resolution of wrongful death claims, which are not considered derivative of a patient's claims, even though the wrongful death claimants were not themselves signatories to the arbitration agreement.  (See *Ruiz*, at p. 841.)  After observing that the statute intended to create "a capacity of health care patients to bind their heirs to arbitrate wrongful death actions," we found that binding the heirs "does not in any sense" extinguish or restrict their claims, "but merely requires that the claims 'be resolved by a common, expeditious, and judicially favored method.' "  (*Id*. at p. 852.)  We firmly rejected the argument that a rule permitting a person to bind his or her adult children to arbitration would violate the state constitutional right to a jury trial.  (Cal. Const., art. I, § 16.)  As we explained, "the Legislature may devise reasonable rules in civil litigation to permit the delegation to another party of the power to consent to arbitration

14

instead of a jury trial. . . . In the present case, the Legislature by statute has created the right of certain heirs to a wrongful death action and may also by statute place reasonable conditions on the exercise of that right." (*Ruiz*, at p. 853.)

While not directly on point, the principles articulated in *Ruiz* support a similar result in the context of recorded declarations. As discussed, the Legislature has crafted a statutory scheme providing for the capacity of a developer to create a condominium development subject to covenants and restrictions governing its operation and use. There appears no question that, under the Davis-Stirling Act, each owner of a condominium unit either has expressly consented or is deemed by law to have agreed to the terms in a recorded declaration. As the exclusive members of an owners association, the owners have every right to expect that the association, in representing their collective interests, will abide by the agreed-upon covenants in the declaration, including any covenant to invoke binding arbitration as an expeditious and judicially favored method to resolve a construction dispute, in the absence of unreasonableness. That a developer and condominium owners may bind an association to an arbitration covenant via a recorded declaration is not unreasonable; indeed, such a result appears particularly important because (1) the Davis-Stirling Act confers standing upon an association to prosecute claims for construction damage in its own name without joining the individual condominium owners (Civ. Code, § 1368.3) and (2) as between an association and its members, it is the members who pay the assessments that cover the expenses of resolving construction disputes. Given these circumstances, an association should not be allowed to frustrate the expectations of the owners (and the developer) by shunning their choice of a speedy and relatively inexpensive means of dispute resolution. Likewise, condominium owners should not be permitted to thwart the expectations of a developer by using an owners association as a shell to avoid an arbitration

15

covenant in a duly recorded declaration. (*Villa Milano*, *supra*, 84 Cal.App.4th at pp. 825-826, fn. 4.)

Amici curiae in support of the Association point to a portion of Civil Code section 1353, subdivision (a), providing that a declaration shall set forth "the restrictions on the use or enjoyment of any portion of the common interest development that are intended to be enforceable equitable servitudes." Focusing on this statutory language, amici curiae assert that the Davis-Stirling Act limits a developer's authority to impose on an owners association only provisions commonly understood as equitable servitudes, that is, restrictions relating to the use or maintenance of the property. (Civ. Code, §§ 1353, subd. (a), 1468, subd. (c).) In their view, an arbitration clause pertaining to construction disputes has no relationship to the use of property and therefore no place in a recorded declaration.

Even assuming that a covenant requiring arbitration of construction disputes does not fall within traditional notions of an equitable servitude, the Davis-Stirling Act, considered as a whole, does not support amici curiae's narrow construction of its provisions. As discussed, the Act specifies that a declaration "may contain any other matters the original signator of the declaration [the developer] or the owners consider appropriate." (Civ. Code, § 1353, subd. (b).) The Act also bars a court from approving an amendment to a declaration that would "eliminate any special rights, preferences, or privileges designated in the declaration as belonging to the declarant, without the consent of the declarant." (Civ. Code, § 1356, subd. (e)(2).) Thus, notwithstanding the traditional uses to which equitable servitudes and recorded declarations have been put, the Act grants developers latitude to place in declarations any term they deem appropriate, including provisions that afford them special rights and privileges, so long as such terms are not unreasonable.

16

It bears emphasis that placement of arbitration covenants in a recorded declaration violates none of the Stirling-Davis Act's proscriptions.[6] To the contrary, their inclusion is consistent with the Department of Real Estate's contemplation that a recorded declaration may feature a provision for binding arbitration between a developer and an owner's association. (Cal. Code Reg., tit. 10, § 2791.8.)[7] In short, there is nothing in the Act itself that prohibits a recorded declaration from containing arbitration covenants.

---

[6] E.g., Civil Code sections 1352.5 (restrictive covenants may not violate Gov. Code, § 12955), 1353.5 (governing display of the United States flag), 1353.6 (governing display of noncommercial signs, posters, flags, or banners on or in an owner's separate interest), 1353.7 (governing roof installation or repair), 1353.8 (governing low water-using plants and landscaping), 1353.9 (governing installation and use of electric vehicle charging stations), 1376 (governing installation and use of video or television antenna), 1360.2 (governing rental or leasing of separate interests), 1360.5 (governing pets).

[7] One of the primary objectives of the Department of Real Estate is the protection of the public interest with regard to offerings of subdivided lands. (See generally Frisella & Nichols, *Department of Real Estate* (2001) 17:2 Cal. Reg. L.Rep. 313.) Pursuant to its rulemaking authority (Bus. & Prof. Code, § 11001), the Real Estate Commissioner promulgated section 2791.8 of title 10 of the California Code of Regulations, which provides in relevant part: "(a) . . . [A] provision in the covenants, conditions and restrictions setting forth terms, conditions and procedures for resolution of a dispute of claim between a homeowners association and a subdivider shall, at a minimum, provide that the dispute or claim resolution process, proceeding, hearing or trial to be conducted in accordance with" specified rules regarding (1) "costs and fees," (2) timely appointment of a neutral person to administer and preside over the dispute resolution process, (3) venue of the proceeding, (4) "prompt and timely commencement" and "prompt and timely conclusion" of the process, (5) conduct of the process "in accordance with rules and procedures that are reasonable and fair to the parties," and (6) authority of the presiding neutral person to provide all recognized remedies available in law or equity for any cause of action that is the basis of the proceeding. (Cal. Code Regs., tit. 10, § 2791.8, subd. (a).) Although the regulation contemplates that an arbitration process in a declaration may be binding or nonbinding, a process that "provides or allows for a judicial remedy in

*(footnote continued on next page)*

Moreover, we find the inclusion of article XVIII in the Project CC&R's is consistent with provisions of the Act that contemplate an alternative dispute resolution process as a prerequisite to construction defect litigation. Civil Code section 1375 provides that before an owners association may file suit against a developer for construction or design defects, the parties must either attempt to settle the dispute or attempt to agree to submit the matter to alternative dispute resolution presided over by a neutral facilitator. One court described these provisions as demonstrating that "the Legislature has chosen to encourage alternative dispute resolution between homeowners associations and developers, *but not to require it*." (*Villa Milano*, *supra*, 84 Cal.App.4th at p. 831 [italics added].) We agree with that specific observation, but see nothing in the language or history of Civil Code section 1375 that purports to prohibit a covenant for binding arbitration of construction defect claims.[8] Indeed, we perceive no legitimate reason to frustrate the expectations of purchasers who choose to buy into a development where binding arbitration is the designated process for resolving such claims. Like other methods of alternative dispute resolution, binding arbitration benefits both the developer and the entire common interest

*(footnote continued from previous page)*

accordance with the laws of this state" presumptively satisfies the regulation's minimum terms. (Cal. Code Regs, tit. 10, § 2791.8, subd. (c).)

[8]     In any event, the FAA's applicability would preempt any statutory provision that specifically discriminates against arbitration. (*Perry v. Thomas*, *supra*, 482 U.S. 483; *Southland Corp. v. Keating*, *supra*, 465 U.S. 1; *Shepard v. Edward Mackay Enterprises, Inc.*, *supra*, 148 Cal.App.4th at p. 1095.)

community by providing a speedy and relatively inexpensive means to address allegations of defect damage to the common areas and other property interests.

In addition to imposing prelitigation procedures for construction disputes, the Davis-Stirling Act requires that an owners association provide "a fair, reasonable, and expeditious procedure" for resolving disputes between an association and a member involving their rights, duties, or liabilities under the governing documents or the applicable statutes. (Civ. Code, § 1363.820, subd. (a); see Civ. Code, § 1363.810, § 1363.830.[9]) The Act also requires that the association and its members use a separate alternative dispute resolution procedure involving a neutral decisionmaker as a prerequisite to filing an "enforcement action" seeking declaratory, injunctive, or writ relief, either alone or in conjunction with a claim falling within the jurisdiction of the small claims court. (Civ. Code, § 1369.510 et seq.; see generally 12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 125, p. 185.) We observe that article XVIII

---

**9**  Civil Code section 1363.830 provides in relevant part: "A fair, reasonable, and expeditious dispute resolution procedure shall at a minimum satisfy all of the following requirements: [¶] (a) The procedure may be invoked by either party to the dispute. . . . [¶] . . . [¶] (c) If the procedure is invoked by a member, the association shall participate in the procedure. [¶] (d) If the procedure is invoked by the association, the member may elect not to participate in the procedure. If the member participates but the dispute is resolved other than by agreement of the member, the member shall have a right of appeal to the association's board of directors. [¶] (e) A resolution of a dispute pursuant to the procedure, that is not in conflict with the law or the governing documents, binds the association and is judicially enforceable. An agreement reached pursuant to the procedure, that is not in conflict with the law or the governing documents, binds the parties and is judicially enforceable. [¶] . . . [¶] (g) A member of the association shall not be charged a fee to participate in the process." (See also Civ. Code, § 1363.840 [setting forth a comparable procedure for "an association that does not otherwise provide a fair, reasonable, and expeditious dispute resolution procedure"].)

comports with these legislative efforts to encourage resolution of condominium matters out of court.

In holding to the contrary, the Court of Appeal made reference to the foregoing dispute resolution schemes and focused on Civil Code section 1369.510, subdivision (a), which states: "The form of alternative dispute resolution chosen pursuant to this article [governing enforcement actions filed by an owner or an association] may be binding or nonbinding, *with the voluntary consent of the parties*." (Italics added.) According to the Court of Appeal, the italicized clause signifies that "the waiver of the right to a jury requires an actual 'agreement' " and that therefore arbitration provisions in a recorded declaration are not binding as an agreement to arbitrate. We disagree.

The language in Civil Code section 1369.510, subdivision (a), simply adheres to the familiar principle that arbitration is a matter of consent, not coercion. The provision does nothing to undermine the conclusion that terms calling for binding arbitration between a developer, condominium owners, and an owners association are properly included in a recorded declaration. (See Cal. Code Regs., tit. 10, § 2791.8.) As explained above, giving force to such terms in a development's originating declaration protects the expectations of the individual owners and the community as a whole (*Citizens for Covenant Compliance*, *supra*, 12 Cal.4th at p. 364), as well as those of the developer (Civ. Code, § 1356, subd. (e)(2).)

Finally, we see nothing in *Treo @ Kettner Homeowners Assn. v. Superior Court* (2008) 166 Cal.App.4th 1055 (*Treo*) that compels a different result. In *Treo*, the covenants, conditions, and restrictions (CC&R's) of a condominium development contained a requirement that all disputes between a developer and a homeowners association be decided by a general judicial reference. The question was whether that requirement was enforceable under Code of Civil Procedure

20

section 638, which allows appointment of a referee (and hence waiver of a jury trial) if a reference agreement exists between the parties. Relying on *Grafton Partners v. Superior Court* (2005) 36 Cal.4th 944 (*Grafton*), *Treo* determined that a waiver of the constitutional right to trial by jury requires "actual notice and meaningful reflection." (*Treo*, *supra*, 166 Cal.App.4th at p. 1066.) Because the jury waiver in the subject CC&R's did not meet those requirements, *Treo* held it was "not a written contract as the Legislature contemplated the term in the context of [Code of Civil Procedure] section 638." (*Treo*, at p. 1067.) The *Treo* court was particularly troubled that the CC&R's were lengthy and adhesive in nature, and that the jury waiver was not signed by the parties and could not be modified by the association. (*Ibid.*) Persuaded by *Grafton*'s observation that any statutory ambiguity in permitting a jury waiver must be resolved in favor of affording a jury trial (*Grafton*, at p. 956), *Treo* concluded that, even though CC&R's "can reasonably be 'construed as a contract' . . . when the issue involved is the operation or governance of the association or the relationships between owners and between owners and the association," CC&R's do not "suffice as a contract when the issue is the waiver pursuant to [Code of Civil Procedure] section 638 of the constitutional right to trial by jury." (*Treo*, at p. 1066.)

The Association's reliance on that decision misplaced for at least two reasons. First, neither *Treo* nor *Grafton* concerned an agreement to arbitrate. Notably, *Grafton* explicitly distinguished predispute jury waivers from predispute arbitration agreements, observing that arbitration agreements are specifically authorized by Code of Civil Procedure section 1281, and, unlike jury waivers, "represent an agreement to avoid the judicial forum altogether." (*Grafton*, *supra*, 36 Cal.4th at p. 955.) Because public policy strongly favors arbitration as " ' " 'a speedy and relatively inexpensive means of dispute resolution' " ' " (*Schatz v. Allen Matkins Leck Gamble & Mallory LLP*, *supra*, 45 Cal.4th at p. 564), we

decline to read additional unwritten procedural requirements, such as actual notice and meaningful reflection, into the arbitration statute.[10]

Second, whether or not a reference agreement must be evaluated differently from other types of agreements, state laws that discriminate against arbitration are preempted where, as here, the FAA applies. That is, the FAA precludes judicial invalidation of an arbitration clause based on state law requirements that are not generally applicable to other contractual clauses, such as proof of actual notice, meaningful reflection, signature by all parties, and/or a unilateral modification clause favoring the nondrafting party. (*Doctor's Associates, Inc. v. Casarotto* (1996) 517 U.S. 681, 687-688 (*Doctor's Associates*) [FAA preempts state's first-page notice requirement for arbitration agreements].) It stands to reason that the FAA would preempt state decisional law singling out an arbitration clause as the only term in a recorded declaration that may not be regarded as contractual in nature. For this reason, we shall not selectively target article XVIII as containing the only clause of the recorded declaration that does not memorialize an agreement binding the Association.[11]

In sum, even though the Association did not bargain with Pinnacle over the terms of the Project CC&R's or participate in their drafting, it is settled under the statutory and decisional law pertaining to common interest developments that the

---

[10]    *Grafton* also distinguished predispute jury waivers from the very type of predispute reference agreement at issue in *Treo*, noting that Code of Civil Procedure section 638 authorizes reference agreements. (*Grafton*, *supra*, 36 Cal.4th at p. 959.)

[11]    Likewise, we shall not, as the Association urges, target the arbitration clause as the only covenant in the recorded declaration that requires ratification by the Association's governing board in order to bind the Association and its members.

22

covenants and terms in the recorded declaration, including those in article XVIII, reflect written promises and agreements that are subject to enforcement against the Association. (Civ. Code, § 1350 et seq.; *Nahrstedt*, *supra*, 8 Cal.4th at pp. 378-384.)

### C. The Doctrine of Unconscionability

Having determined that article XVIII of the Project CC&R's is binding on the Association, we next determine whether the article's provisions for arbitration are unenforceable as unconscionable.

"[G]enerally applicable contract defenses, such as . . . unconscionability, may be applied to invalidate arbitration agreements without contravening" the FAA. (*Doctor's Associates*, *supra*, 517 U.S. at p. 687; accord, *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114 (*Armendariz*).) Unconscionability consists of both procedural and substantive elements. The procedural element addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power. (See *Armendariz*, at p. 114; *Little v. Auto Stiegler, Inc.* (2003) 29 Cal.4th 1064, 1071 [procedural unconscionability "generally takes the form of a contract of adhesion"].) Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided. (*Armendariz*, at p. 114; *Mission Viejo Emergency Medical Associates v. Beta Healthcare Group* (2011) 197 Cal.App.4th 1146, 1159.) A contract term is not substantively unconscionable when it merely gives one side a greater benefit; rather, the term must be "so one-sided as to 'shock the conscience.' " (*24 Hour Fitness, Inc. v. Superior Court*, *supra*, 66 Cal.App.4th at p. 1213.)

The party resisting arbitration bears the burden of proving unconscionability. (*Engalla v. Permanente Medical Group, Inc.*, *supra*, 15 Cal.4th at p. 972; *Mission Viejo Emergency Medical Associates v. Beta Healthcare Group*, *supra*, 197 Cal.App.4th at p. 1158.) Both procedural unconscionability and substantive unconscionability must be shown, but "they need not be present in the same degree" and are evaluated on " 'a sliding scale.' " (*Armendariz*, *supra*, 24 Cal.4th at p. 114.) "[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Ibid*.)

As indicated, procedural unconscionability requires oppression or surprise. " 'Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form.' " (*Morris v. Redwood Empire Bancorp* (2005) 128 Cal.App.4th 1305, 1317.) Here, the trial court found no evidence of surprise.[12] Nonetheless, the court perceived a high degree of procedural unconscionability, because the Project CC&R's were drafted and recorded by Pinnacle before any unit was purchased and before the Association was formed. Noting the Association had no opportunity to participate in the drafting of the

---

[12] We agree. The record reflects that the arbitration provisions of the Project CC&R's appear in a separate article under a bold, capitalized, and underlined caption titled "ARTICLE XVIII CONSTRUCTION DISPUTES," and within a separate section with the bold and underlined title, "Section 18.3. Resolution of Construction Disputes by Arbitration." The provision referring to FAA applicability, and the provision describing the waivers of jury trial and right to appeal, are set forth in separate subsections of Section 18.3, with the latter appearing in bold and capital letters. (See *ante*, fn. 2.) Additionally, the recitals on page 2 of the Project CC&R's state, in capital letters, that article XVIII of the declaration "refers to mandatory procedures for the resolution of construction defect disputes, including the waiver of the right to a jury trial for such disputes."

recorded declaration, the court determined it was oppressive. (See *Villa Milano*, *supra*, 84 Cal.App.4th at p. 828 [finding procedural unconscionability "obvious" where condominium purchasers had no opportunity to negotiate declaration's terms].) This analysis is off the mark.

That the Project CC&R's were drafted and recorded before the sale of any unit and without input from the Association was a circumstance dictated by the legislative policy choices embodied in the Davis-Stirling Act. (Civ. Code, § 1352; see also Bus. & Prof. Code, §§ 11018.1, 11018.2, 11018.5, subd. (c).) The intent of the Act is to permit landowners such as Pinnacle to develop and market their properties to purchasers as condominium developments operating under certain covenants and restrictions. By providing for Pinnacle's capacity to record a declaration that, when accepted by the first purchaser binds all others who accept deeds to its condominium properties, the Act ensures that the terms reflected in the declaration — i.e., the covenants, conditions, and restrictions governing the development's character and operation — will be respected in accordance with the expectations of all property owners and enforced unless proven unreasonable. (*Nahrstedt*, *supra*, 8 Cal.4th at pp. 378-384; see *Citizens for Covenant Compliance*, *supra*, 12 Cal.4th at p. 365.) Thus, while a condominium declaration may perhaps be viewed as adhesive, a developer's procedural compliance with the Davis-Stirling Act provides a sufficient basis for rejecting an association's claim of procedural unconscionability.[13]

_____

[13]    Indeed, if an association could avoid an arbitration covenant in a recorded declaration on the ground that it did not negotiate for the covenant, then it would follow that, notwithstanding the Act's operation, the association would not be bound by *any* of the covenants, conditions, or restrictions in the declaration. The position is untenable.

25

Moreover, the arbitration provisions of article XVIII are not substantively unconscionable. Preliminarily, we observe the Association has not shown that article XVIII fails to conform to the minimum regulatory standards for protection of the public interest. (Cal. Code Regs., tit. 10, § 2791.8; see *ante*, fn. 7.) Here, in fact, the Department of Real Estate reviewed and approved the Project CC&R's before issuing the required public report for the Project. (Bus. & Prof. Code, §§ 11004.5, subd. (c), 11018.2, 11018.5.) On this point, the Association correctly asserts that neither the public report's issuance nor the regulation itself binds us in determining enforceability of the arbitration provisions. Nonetheless, as discussed below, the Association neglects to identify any aspect of article XVIII that is overly harsh or so one-sided that it shocks the conscience. (*24 Hour Fitness, Inc. v. Superior Court*, *supra*, 66 Cal.App.4th at p. 1213.)

In arguing that article XVIII is substantively unconscionable, the Association invokes the following passage in *Armendariz*, *supra*, 24 Cal.4th 83: "[A]n arbitration agreement imposed in an adhesive context lacks basic fairness and mutuality if it requires one contracting party, but not the other, to arbitrate all claims arising out of the same transaction or occurrence or series of transactions or occurrences." (*Id*. at p. 120.) The Association then posits that article XVIII lacks basic fairness and mutuality because it allows Pinnacle to require arbitration of all construction disputes related to the Project, without requiring Pinnacle to arbitrate any claims it may have against the Association or the owners. This contention fails to persuade.

In the same part of *Armendariz*, we made clear that arbitration clauses may be limited to a specific subject or subjects and that such clauses are not required to "mandate the arbitration of all claims between [the parties] in order to avoid invalidation on grounds of unconscionability." (*Armendariz*, *supra*, 24 Cal.4th at p. 120.) Here, the challenged clause is limited to construction disputes. To the

26

extent Pinnacle wishes to allege the Association's comparative fault as an affirmative defense with respect to damages (Civ. Code, § 1368.4, subd. (a)),[14] such issue would fall within the scope of article XVIII. Apart from that, the Association fails to identify any potential construction-related claim Pinnacle might assert against it that would not be subject to arbitration. Accordingly, there appears no support for the Association's claims of unfairness and absence of mutuality.

The Association next complains of a clause in article XVIII that provides: "Each of the parties shall bear its own attorney's fees and costs (including expert witness costs) in the arbitration." Notwithstanding the facial neutrality of this costs provision, the Association asserts it is evidence of substantive unconscionability because it effectively limits the Association's right to full recovery of damages. (See *Armendariz*, *supra*, 24 Cal.4th at p. 121.)

The costs provision does no such thing. In court proceedings, a prevailing party generally may not recover expert witness fees as *an item of costs* unless the expert witness was appointed by the court. (Code Civ. Proc., § 1033.5, subd. (b)(1); *Carwash of America-PO v. Windswept Ventures No. I* (2002) 97 Cal.App.4th 540, 543-544; *Stearman v. Centex Homes* (2000) 78 Cal.App.4th 611, 623-624; cf. Code Civ. Proc., § 1033.5, subd. (a)(8) ["[f]ees of expert witnesses ordered by the court" are allowable as costs].) By its terms, the costs provision will neutrally benefit whichever party does not prevail in arbitration by barring the prevailing party from recovering such fees as an item of costs. At the

---

**14** Pursuant to Civil Code section 1368.4, subdivision (a), an owners association's recovery of damages in a construction defect action "shall be reduced by the amount of damages allocated to the association or its managing agents in direct proportion to their percentage of fault based upon principles of comparative fault."

27

same time, article XVIII elsewhere specifies that "[t]he arbitrator is authorized to provide all recognized remedies available at law or in equity for any cause of action." Pinnacle confirms that the costs provision does not alter the Association's "potential remedies as a litigant," and that the Project CC&R's "were drafted so that the parties' remedies would *not* change." Accordingly, the costs provision does not limit the availability of expert investigation expenses that are otherwise recoverable as *damages*. (E.g., *Stearman*, at pp. 624-625 [even when expert witness fees are not recoverable as costs, expert investigation fees may be recovered as an item of damages under Civ. Code, § 3333].) In light of the foregoing, the costs provision provides little, if any, evidence of substantive unconscionability. (See *Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 711 [upholding an arbitration provision that did not purport to limit a party's substantive obligations or liabilities, but "merely substitute[d] one forum for another"]; see also *Ruiz*, *supra*, 50 Cal.4th at p. 852.)

The Association further points out that the Project CC&R's imposes a requirement that the Association obtain Pinnacle's written consent before amending the arbitration provisions. Emphasizing that Pinnacle drafted the document before the Association existed as an independent entity, the Association claims the consent provision demonstrates that Pinnacle was "looking after its own self-interests" and playing "unfairly to its unilateral benefit." The Association also argues the consent provision "virtually eliminates the Association's right to amend the [Project CC&R's] pursuant to Civil Code sections 1355 and 1356."

These arguments lack merit. First, Civil Code section 1355 specifically contemplates that a recorded declaration may restrict or even eliminate the authority of an owners association and owners to amend its terms. (Civ. Code, § 1355, subd. (b) [permitting amendment "[e]xcept to the extent that a declaration provides by its express terms that it is not amendable"].) Second, and more to the

28

point, Civil Code section 1356 flatly prohibits a court from approving any amendment to a declaration that "[w]ould eliminate any special rights, preferences, or privileges designated in the declaration as belonging to the declarant, without the consent of the declarant." (Civ. Code, § 1356, subd. (e)(2).) Far from evidencing substantive unconscionability, the consent provision reflects a restrictive term that the Legislature, for policy reasons, has determined is reasonably and properly included in a recorded declaration.

We conclude that article XVIII of the Project CC&R's is consistent with the provisions of the Davis-Stirling Act and is not procedurally or substantively unconscionable. Its terms requiring binding arbitration of construction disputes are therefore enforceable.[15]

---

[15] We are aware that *Villa Milano*, *supra*, 84 Cal.App.4th 819, concluded that arbitration provisions in a recorded declaration are categorically unenforceable as unconscionable and against public policy in light of Code of Civil Procedure section 1298.7. (*Villa Milano*, at pp. 829-833.) *Villa Milano*, however, preceded *Shepard v. Edward Mackay Enterprises, Inc.*, *supra*, 148 Cal.App.4th 1092, which held that the FAA, when applicable, preempts operation of that anti-arbitration statute. (See *ante*, pt. A.) Thus, *Villa Milano* erred in relying on Code of Civil Procedure section 1298.7 as a basis for finding substantive unconscionability. (See *Marmet Health Care Center, Inc. v. Brown* (2012) 565 U.S. __, __ [132 S.Ct. 1201, 1204].) We hereby disapprove *Villa Milano Homeowners Assn. v. Il Davorge*, *supra*, 84 Cal.App.4th 819, to the extent it is inconsistent with any of the views expressed herein.

## CONCLUSION AND DISPOSITION

Even when strict privity of contract is lacking, the Davis-Stirling Act ensures that the covenants, conditions, and restrictions of a recorded declaration — which manifest the intent and expectations of the developer and those who take title to property in a community interest development — will be honored and enforced unless proven unreasonable.  Here, the expectation of all concerned is that construction disputes involving the developer must be resolved by the expeditious and judicially favored method of binding arbitration.

We hold that article XVIII's covenant to arbitrate is not unconscionable and is properly enforced against the Association.  Accordingly, we reverse the judgment of the Court of Appeal and remand the matter for further proceedings consistent with the views herein.

**BAXTER, J.**

**WE CONCUR:**

CANTIL-SAKAUYE, C.J.
CHIN, J.
CORRIGAN, J.
LIU, J.

30

**CONCURRING OPINION BY WERDEGAR, J.**


Can the developer of a condominium project unilaterally impose arbitration on the condominium's homeowners association by recording a mandatory arbitration clause for construction-related claims at or before the association's inception?  Because the Legislature has elected to permit developers to do so, I agree with the majority that a developer can and that the arbitration clause at issue here is enforceable.  Because I think the clause's validity rests on narrower grounds than those invoked by the majority, I write separately.

## I.

Pinnacle Market Development (US), LLC (Pinnacle Development), built a condominium project.  As required under the Davis-Stirling Common Interest Development Act (Civ. Code, § 1350 et seq.; Davis-Stirling Act),[1] it recorded a declaration containing easements, covenants, and restrictions on use of the property (see §§ 1352, subd. (a), 1353).  Included among these covenants and restrictions, Pinnacle Development inserted a clause that compelled arbitration of one specific type of claim—construction disputes—with the homeowners association, the Pinnacle Museum Tower Association (the Homeowners

---

[1]     All further statutory references are to the Civil Code.

1

Association), and individual homeowners each bound as a condition of accepting an interest in the property.

The Homeowners Association evidently was incorporated around the same time the declaration was recorded. That the Homeowners Association had no meaningful independent existence at the time the declaration and arbitration clause were first recorded, and that the clause was drafted unilaterally by Pinnacle Development, are undisputed.

The initial question for us is whether the arbitration clause is binding on the Homeowners Association. In concluding that it is, the majority never clearly states whether the grounds for enforcement lie in contract or real property law. In my view, only real property law supports enforcement.

## A.

Considered as contracts, the recorded declaration and the arbitration clause are adhesive vis-à-vis individual homeowners, but adhesive contracts can still be enforced. (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 113.) Individual homeowners can elect to buy property subject to the recorded declaration and the arbitration clause, or not; some semblance of a choice is still present, and courts have properly found such individual owners bound as a matter of contract law. (E.g., *Villa Milano Homeowners Assn. v. Il Davorge* (2000) 84 Cal.App.4th 819, 824-826.)

But the rationale that would make recorded covenants and restrictions contractually enforceable against individual owners does not extend to a homeowners association. Vis-à-vis such an association, the recorded declaration is more than adhesive; no opportunity for meaningful consent exists at all. A homeowners association cannot refuse to accept title to the development's common areas or the responsibilities of management; once it comes into existence, it is automatically subject to whatever the developer has seen fit to insert in the

2

declaration, without any opportunity to reject those terms. To treat this scenario as involving consent rather than compulsion is to disregard the realities of the situation. I thus agree with the Court of Appeal that the scenario here does not fit within traditional bilateral, or even unilateral, contract formation principles.

The majority states that we have in the past treated covenants in declarations as contractual (see maj. opn., *ante*, at pp. 12-13, citing *Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 380-381, and *Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 512-513), thus implying that to do so here is unexceptional. In *Nahrstedt*, we applied contract *interpretation* principles to a recorded restriction; in *Frances T.*, we *assumed* the truth of an individual owner's allegation that covenants in a recorded declaration were part of a contract between her and her homeowners association. In neither case did we analyze whether contract formation principles, as applied to the terms of a recorded declaration, supported treating those terms as a binding contract between a developer and a homeowners association. Nor do any of the other cases the majority cites, *ante*, at page 13 articulate a rationale for treating the covenants, conditions, and restrictions in a recorded declaration as a binding contract between a developer and a homeowners association. Indeed, the one case most clearly to conclude that the covenants in a declaration form a binding contract between a developer and a homeowners association expressly acknowledged that, unlike for individual owners, who have notice at the time of purchase of a declaration's terms, the extant case law does "not provide an analytical framework for addressing the issue why the *homeowners association*, which makes no purchase,

3

is also bound contractually." (*Villa Milano Homeowners Assn. v. Il Davorge*, *supra*, 84 Cal.App.4th at p. 825, fn. 4, italics added.)[2]

The majority suggests declarations should be enforced as contracts to protect the expectations of the individual owners who buy property in a given development. (E.g., maj. opn., *ante*, at p. 18 ["[W]e perceive no legitimate reason to frustrate the expectations of purchasers who choose to buy into a development where binding arbitration is the designated process for resolving such claims."].) This emphasis on the supposed expectations and wishes of homeowners appears disingenuous. While owners may have agreed to the arbitration clause, they did so only in the context of an adhesive, take-it-or-leave-it transaction. That the presence of such a clause would play much, if any, of a favorable role in as momentous a decision as the choice of a home to purchase is not readily apparent.

Accordingly, to the extent the majority rests enforcement of the arbitration clause against the Homeowners Association on contract principles, I part company.

### B.

That a covenant in a declaration is unenforceable as a contract is not dispositive if another ground for enforcement exists. Here, one does.

At common law, enforceable equitable servitudes and covenants running with the land were confined to restrictions that benefited or burdened land.

---

[2] Although *Villa Milano* acknowledged that existing precedent did not explain why a homeowners association should be bound as a matter of contract, because the parties did not raise this point the court simply assumed that a homeowners association exclusively represented individual owners' interests and should not be permitted to avoid what the owners themselves could not avoid. (*Villa Milano Homeowners Assn. v. Il Davorge*, *supra*, 84 Cal.App.4th at p. 825, fn. 4.) Not so; the Homeowners Association has its own separate property interests and its own potential claims.

(*Citizens for Covenant Compliance v. Anderson* (1995) 12 Cal.4th 345, 352-355.) The same holds true today; whether described as a covenant running with the land or an equitable servitude, a restriction enforceable under these doctrines and the statutes embodying them must involve a restriction governing land use. (*Nahrstedt v. Lakeside Village Condominium Assn.*, *supra*, 8 Cal.4th at p. 380 ["[E]quitable servitudes permit courts to enforce promises restricting land use when there is no privity of contract . . . ."]; *Anthony v. Brea Glenbrook Club* (1976) 58 Cal.App.3d 506, 510 ["[T]he covenant '. . . must affect the parties as owners of particular estates in land, or must relate to the *use of land.*' "]; § 1461 [only those covenants specified by statute may "run with the land"]; § 1462 ["Every covenant contained in a grant of an estate in real property, which is made for the direct benefit of the property, or some part of it then in existence, runs with the land."]; § 1468 [covenant enforceable as running with the land is one which is "for the benefit of the land"].)

However, the Legislature is free to abrogate these common law requirements if it sees fit.  If the Davis-Stirling Act expands the universe of provisions enforceable as equitable servitudes beyond those that would qualify under the common law, that the arbitration clause might not be enforceable in contract or at common law as a covenant running with the land or an equitable servitude is immaterial:  a provision that qualifies under the act may be enforced as a matter of statute.

Under the Davis-Stirling Act, '[t]he covenants and restrictions in [a] declaration shall be enforceable equitable servitudes . . . ."  (§ 1354, subd. (a).)  In *Villa De Las Palmas Homeowners Assn. v. Terifaj* (2004) 33 Cal.4th 73, 87, we considered and rejected a condominium owner's argument that recorded covenants and restrictions "must meet the common law requirements of equitable servitudes" in order to be enforceable.  We concluded that under section 1354, subdivision (a)

5

recorded covenants and restrictions are either deemed enforceable equitable servitudes, whether or not they satisfy the common law requirements, or are enforceable in the same manner as equitable servitudes. We had no occasion to decide which interpretation was correct because "[e]ither reading precludes the conclusion that the Legislature intended to incorporate the technical requirements of equitable servitudes into the statutes." (*Terifaj*, at p. 87.)

*Terifaj* establishes that the Davis-Stirling Act makes the covenants in a recorded declaration enforceable without regard to whether they satisfy common law requirements for covenants running with the land or equitable servitudes. Accordingly, irrespective of whether the arbitration clause before us does or does not satisfy the traditional requirements for equitable servitudes, the clause is enforceable as an equitable servitude, or in the same manner as an equitable servitude, as a matter of statute. (*Villa De Las Palmas Homeowners Assn. v. Terifaj*, *supra*, 33 Cal.4th at p. 87.)

The majority reaches the same conclusion, but relies in heavy part on section 1353, subdivision (b), which authorizes a developer or homeowners to include in the declaration "any other matters [they] consider appropriate." (See maj. opn., *ante*, at p. 16.) In contrast to the restrictions included pursuant to subdivision (a) of section 1353, however, it does not follow that any matter included under subdivision (b) thereby becomes an enforceable equitable servitude. Indeed, subdivision (a) gives examples of just the sort of extra matters a developer might elect to include that would be permitted by subdivision (b) but are nevertheless not equitable servitudes: subdivision (a) mandates inclusion of standard notices for all subdivisions in proximity to an airport or falling within a particular conservation district. (§ 1353, subd. (a)(1)-(3).) A developer might elect to include, under subdivision (b), similar notices of other circumstances that would affect the decision to purchase property, without such notices becoming

6

equitable servitudes.  Accordingly, I would rest enforcement of the arbitration clause on section 1353, subdivision (a) and section 1354, not on section 1353, subdivision (b).

## II.

The question remains whether the arbitration clause, though facially enforceable against the Homeowners Association, is valid.  Because the clause's enforceability derives from statute, not contract law, I would conclude the limits on its validity also derive from statute, not contract law.  I therefore would focus on whether the clause is reasonable as required by statute, not whether it is unconscionable and thus contractually unenforceable.  (See § 1354, subd. (a) ["The covenants and restrictions in the declaration shall be enforceable equitable servitudes, unless unreasonable . . . .].)  Under section 1354, covenants or restrictions in a declaration will "be enforced unless they are wholly arbitrary, violate a fundamental public policy, or impose a burden on the use of affected land that far outweighs any benefit."  (*Nahrstedt v. Lakeside Village Condominium Assn.*, *supra*, 8 Cal.4th at p. 382.)

The Homeowners Association bears the burden of establishing unreasonableness under section 1354.  (*Nahrstedt v. Lakeside Village Condominium Assn.*, *supra*, 8 Cal.4th at p. 380.)  It has not sought to do so expressly, instead framing its argument against enforcement in terms of contract principles of procedural and substantive unconscionability.  Even treating that argument as applying equally to the reasonableness requirement, i.e., as an argument that the arbitration clause is unconscionable, and thus against public policy and thus unreasonable, the Homeowners Association has not carried its burden.

To be sure, the adoption of the arbitration clause has elements of procedural unconscionability.  Contrary to the majority's view, that the Davis-Stirling Act

7

contemplates a developer will draft and record covenants and restrictions before a homeowners association has any realistic opportunity to consent does not mean any resulting procedural unconscionability is categorically excused. (See maj. opn., *ante*, at p. 25.) Nothing is to stop a developer from providing a homeowners association a meaningful opportunity, once it achieves independence, to ratify or reject covenants and restrictions touching on the developer's interests. In the absence of such an opportunity, we should make clear that provisions inserted unilaterally for the developer's benefit must receive careful scrutiny under section 1354 to prevent abuse of the unilateral drafting power required by the nature of common interest developments.

That said, the Homeowners Association has not shown in *this* case that the arbitration clause constitutes such an abuse. The Homeowners Association objects to a provision that each side shall bear its own costs and attorney fees, but I agree with the majority that nothing in that clause evidences substantive unconscionability. (See maj. opn., *ante*, at pp. 27-28.) The Homeowners Association also raises the clause's limited scope—construction claims—as proof of the lack of " 'a modicum of bilaterality' " we have in the past demanded. (*Armendariz v. Foundation Health Psychcare Services, Inc.*, *supra*, 24 Cal.4th at p. 119.) An arbitration clause is not, however, required to sweep in every possible claim either of two parties might have against each other; bilaterality is satisfied if, for the particular transaction or transactions covered, each side must submit its possible claims to the arbitral forum. (*Id.* at p. 120.) As the majority holds (maj. opn., *ante*, at pp. 26-27), an arbitration clause that covers all claims arising from construction of a development does not, because it excludes nonconstruction claims, offend public policy and become unenforceable under section 1354.

8

For these reasons, I concur in the judgment of the court.

**WERDEGAR, J.**

**CONCURRING OPINION BY LIU, J.**


I join the court's opinion. I also find much that is persuasive in Justice Werdegar's concurrence. In my view, the court's opinion and Justice Werdegar's concurrence are not that far apart.

This case requires us to answer two questions. The first is whether a provision of a declaration of restrictions for a common interest development requiring arbitration of any construction defect disputes between a homeowners association and a developer can ever be enforceable against the association. The conceptual difficulty is that this provision defies easy categorization. Both the court and Justice Werdegar acknowledge that there was no privity of contract between the homeowners association, Pinnacle Museum Tower Association, and the developer, Pinnacle Market Development, and that the provision is thus not a contractual arbitration agreement in the strict sense. (Maj. opn., *ante*, at p. 30; conc. opn. of Werdegar, J., *ante*, at p. 3.) Both appear to recognize that the provision is not one of the typical property restrictions running with the land that are enforceable as equitable servitudes. (Maj. opn., *ante*, at p. 16; conc. opn. of Werdegar, J., *ante*, at p. 3.)


1

Further, both acknowledge that the developer's authorization to include such a provision arises primarily from the Davis-Stirling Act. (Maj. opn., *ante*, at pp. 16-17; conc. opn. of Werdegar, J., *ante*, at pp. 5-6.) Justice Werdegar would locate that authorization in Civil Code sections 1353, subdivision (a) and 1354, subdivision (a) (all statutory references are to this code). Section 1353, subdivision (a) pertains to "restrictions on the use or enjoyment of any portion in of a common interest development." Because the arbitration provision in question does not neatly fit into that category, I agree with the court that authorization for the provision is more appropriately located in section 1353, subdivision (b): "The Declaration may contain any other matters the original signator of the declaration or the owners consider appropriate."

The court affirms that arbitration is binding only insofar as both parties consent in some fashion to the waiver of the right to a jury trial. Despite the fact that the homeowners association came into existence already bound by the arbitration provision, the court still finds the arbitration provision to be consensual: "There appears no question that, under the Davis-Stirling Act, each owner of a condominium unit either has expressly consented or is deemed by law to have agreed to the terms in a recorded declaration. As the exclusive members of an owners association, the owners have every right to expect that the association, in representing their collective interests, will abide by the agreed-upon covenants in the declaration, including any covenant to invoke binding arbitration as an expeditious and judicially favored method to resolve a construction dispute, in the absence of unreasonableness." (Maj. opn., *ante*, at p. 15.)

2

I agree with Justice Werdegar that in reality, it is doubtful that the presence of an arbitration clause was a salient feature of a home purchase transaction. (Conc. opn. of Werdegar, J., *ante*, at p. 4.)  But I agree with the court that in the unique statutory context of the Davis-Stirling Act, the notice of the arbitration provision given to homeowners who became the members of the homeowners association rendered the arbitration provision sufficiently consensual to legitimately bind the association.

Because these types of arbitration provisions may lawfully be applied to homeowners associations under the Davis-Stirling Act, the second question we are asked to address is whether the terms of this particular arbitration provision are lawful.  I agree with Justice Werdegar that the proper inquiry is whether the terms of the provision are "unreasonable." (§ 1354, subd. (a).)  The inquiry under that statute, however, has been keyed to whether a property restriction has a "rational relationship to the protection, preservation, operation or purpose of the affected land." (*Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 381.)  Because what is at issue here is not a property restriction in the usual sense but rather an arbitration clause for resolving construction defect disputes, the court properly recognizes that the appropriate inquiry is whether the arbitration clause is unreasonably one-sided in favor of the party imposing the arbitration — that is, whether the arbitration clause is substantively unconscionable.  The court is also correct in stating that "while a condominium declaration may perhaps be viewed as adhesive, a developer's procedural compliance with the Davis-Stirling Act provides a sufficient basis for rejecting an association's claim of procedural unconscionability." (Maj. opn., *ante*, at p. 25.)

In sum, I understand today's opinion to hold that whether or not the arbitration provision is contractual in the strict sense, it is appropriate in this case to use the substantive unconscionability inquiry from contract law to determine whether the arbitration clause is reasonable and hence lawful. With that understanding, I join the opinion of the court.

LIU, J.

**DISSENTING OPINION BY KENNARD, J.**

A condominium owners association sued the project's developer over construction defects. The developer sought to have the dispute arbitrated.

The majority holds that the owners association is bound by an arbitration provision in the declaration of covenants, conditions, and restrictions (CC&R's) drafted by the developer *before* the association came into existence as an independent entity. I disagree, because of the association's lack of consent to the arbitration provision.

**I**

Defendant condominium developer drafted and recorded CC&R's that, among other things, provided for the creation of a nonprofit corporation to be called the "Pinnacle Museum Tower Association," plaintiff here. The CC&R's also stated that acceptance of any property deed would indicate agreement to have any construction dispute against the developer resolved through binding arbitration. When the developer recorded the CC&R's, the owners association, as the majority acknowledges, had no existence independent of the developer.

After the developer completed construction and disposed of its interests in the condominium project, and after the association became an independent entity, the association sued the developer over various construction defects, including drainage and electrical problems. Relying on the arbitration provision in the CC&R's, the developer asked the trial court to compel arbitration. The trial court

1

denied the petition. The Court of Appeal upheld that ruling. This court then granted defendant's petition for review.

## II

Arbitration, which is an alternative to the judicial process (*Berglund v. Arthroscopic & Laser Surgery Center of San Diego, L.P.* (2008) 44 Cal.4th 528, 539), "is a matter of consent, not coercion" (*Volt Info. Sciences v. Leland Stanford Jr. U.* (1989) 489 U.S. 468, 479). Thus, an arbitration provision is binding only if the parties have agreed to it. (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 10.)

When defendant developer here recorded the CC&R's, plaintiff owners association had no independent existence (see *ante*, at p. 1) and hence no say in the developer's unilateral decision to have any construction disputes decided by binding arbitration. Lacking therefore is the association's consent to the arbitration provision in the CC&R's.

According to the majority, however, the owners association's consent to the arbitration provision can be inferred from consent to it by the developer and individual condominium owners. (Maj. opn., *ante*, at pp. 14-15.) In support, the majority cites this court's decision in *Ruiz v. Podolsky* (2010) 50 Cal.4th 838 (*Ruiz*). But that decision is not on point here.

The issue in *Ruiz* was whether an arbitration agreement between a physician and a patient (who consented to arbitration) applied to wrongful death claims brought by the deceased patient's heirs against the physician. A majority of this court concluded that the arbitration agreement extended to the patient's heirs. The majority relied on Code of Civil Procedure section 1295, which states that any arbitration provision in a contract for medical services must be mentioned in the contract's first article. The statute also requires the contract to state that by agreeing to arbitration the parties give up their constitutional right to a jury trial. This statute, the *Ruiz* majority asserted, was designed "to permit patients who sign arbitration agreements to bind their heirs in wrongful death actions." (*Ruiz, supra*, 50 Cal.4th at p. 849.) I dissented, expressing the view that the statute said nothing

2

about a deceased patient's heirs' wrongful death claims, which are independent claims of the heirs, rather than being derivative of any claim by the patient. (*Id.* at pp. 855-858 (dis. opn. of Kennard, J.).)

The majority in *Ruiz* expressly limited its holding to wrongful death claimants. (*Ruiz*, *supra*, 50 Cal.4th at p. 854, fn. 5.) Such claimants are not involved in this case, in which a developer seeks to compel an owners association to arbitrate construction defect claims.

Moreover, *Ruiz* involved a statute that, as described by the majority, reflected a legislative intent that supported the majority's holding. (*Ruiz*, *supra*, 50 Cal.4th at p. 849.) In contrast, the legislative scheme governing condominium developments, as involved here, indicates that the developer *cannot* unilaterally bind the owners association to arbitrate its construction defect claims. As expressed in Civil Code section 1369.510, subdivision (a), whether parties in common interest developments are bound by alternative dispute resolution procedures, such as arbitration, requires "the voluntary consent of the parties." Thus, consent by the developer alone is insufficient.

Also unconvincing is the majority's assertion that individual owners can consent to arbitration on behalf of the owners association. (Maj. opn., *ante*, at p. 15.) According to the majority, because the individual owners are the exclusive members of the association, the owners have the right to expect the association to be bound by the binding arbitration provision. (*Ibid.*) The association and the individual owners are not the same, however. The majority itself acknowledges that: "There is, of course, no question that an owners association functions as an entity distinct and separate from its owner members and may hold title to real property in a condominium development in its own name." (Maj. opn., *ante*, at pp. 12-13.) Thus, consent by the owners association itself is necessary before it can be compelled to submit to binding arbitration.

As I have explained, lacking here is the owners association's consent to an arbitration provision in the CC&R's drafted and recorded by the developer before

3

the association's independent existence.  In compelling arbitration, which offers no right to a jury, the majority deprives the owners association of its constitutional right to have its construction defect dispute decided by a jury.  In the words of our state Constitution:  "Trial by jury is an inviolate right and shall be secured to all . . . ."  (Cal. Const., art. I, § 16.)  This constitutional right, this court has said, "may not be abridged by act of the Legislature."  (*People v. Collins* (1976) 17 Cal.3d 687, 692.)

I would affirm the judgment of the Court of Appeal.


KENNARD, J.

4

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Pinnacle Museum Tower Association v. Pinnacle Market Development (US), LLC
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 187 Cal.app.4th 24
**Rehearing Granted**

_____

**Opinion No.** S186149
**Date Filed:** August 16, 2012
_____

**Court:** Superior
**County:** San Diego
**Judge:** Ronald L. Styn

_____

**Counsel:**

Wood, Smith, Henning & Berman, Daniel A. Berman, Sheila E. Fix, R. Gregory Amundson, Nicholas M. Gedo; Hecht Solberg Robinson Goldberg & Bagley, Jerold H. Goldberg, Richard A. Schulman, Gregory S. Markow and Amanda A. Allen for Defendants and Appellants.

Luce, Forward, Hamilton & Scripps, Kathleen F. Carpenter for California Building Industry Association as Amicus Curiae on behalf of Defendants and Appellants.

Feinberg Grant Mayfield Kaneda & Litt, Fenton Grant Mayfield Kaneda & Litt,Daniel H. Clifford, Joseph Kaneda, Charles Fenton and Bruce Mayfield for Plaintiff and Respondent.

Berding & Weil, Matt J. Malone, Tyler P. Berding; Epstein Grinnell & Howell, Anne L. Rauch, Jon Epstein, Douglas Grinnell; Niddrie Fish & Addams and David A. Niddrie for Executive Council of Homeowners and Consumer Attorneys of California as Amici Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jerold H. Goldberg
Hecht Solberg Robinson Goldberg & Bagley
600 W. Broadway, 8th Floor
San Diego, CA  92101
(619) 239-3444

Bruce Mayfield
Fenton Grant Mayfield Kaneda & Litt
18101 Von Karman Avenue, Suite 1940
Irvine, CA  92612
(877) 520-3455